Filed 7/28/16  P. v. Williams CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　　　v.<br><br>MARQUETTA SHAVON WILLIAMS,<br><br>　　　Defendant and Appellant. | F069383<br><br>(Super. Ct. No. BF151111A)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John W. Lua, Judge.

Tracy A. Rogers, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Kathleen A. McKenna and William K. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury convicted appellant Marquetta Shavon Williams of committing, among other offenses, three counts of felony vandalism (Pen. Code, § 594, subd. (b)(1); counts 2, 6 & 7),[1] arising from an incident during which appellant entered and damaged a

---

[1]    Further statutory references are to the Penal Code unless otherwise specified.

number of items inside the victim's house, before returning outside and damaging two of his cars by driving into them. On appeal, appellant contends: (1) the trial court erred by deferring its ruling on her motion for a judgment of acquittal (§ 1118.1) with respect to counts 6 and 7, which were based on her vandalism of the two cars, and by allowing the prosecution to present rebuttal evidence showing the amount of damage she inflicted on each car exceeded $400; (2) counts 6 and 7 must be reversed because all her acts of vandalism were committed pursuant to one general intent, impulse, and plan, and therefore, constituted a single offense under *People v. Bailey* (1961) 55 Cal.2d 514 (*Bailey*); and (3) assuming we reject her first two contentions, the terms imposed on counts 6 and 7 must be stayed under section 654. For reasons we shall explain, we disagree with appellant's contentions and will affirm the judgment.

## *FACTUAL AND PROCEDURAL BACKGROUND*

### The Prosecution's Evidence

On October 9, 2013, Saleta Roseburr was sleeping at the house of her boyfriend, Clark Alexander, when, shortly after midnight, she awoke to loud sounds of yelling and breaking glass. As Alexander walked into the bedroom, Roseburr sat up and asked him what was going on. At first, Alexander said it was nothing, but then Roseburr heard screaming and he told her appellant was "out there." Roseburr, who had been involved in a prior confrontation with appellant, asked Alexander to "handle the situation."

After Alexander left the bedroom, Roseburr continued to hear appellant's voice, which sounded upset, as well as the sounds of "loud bangs" and "things breaking." The sounds seemed to be coming primarily from inside the house. However, at one point, they seemed to move outside before moving back inside again.

After the sounds seemed to have moved back inside the house, Roseburr heard appellant arguing with a man who kept telling her to calm down. Roseburr peeked out the bedroom door and saw appellant "throwing things" including knives and kitchen utensils. Roseburr then locked the bedroom door and called her sister.

2.

A short time later, appellant kicked open the locked bedroom door, came inside the room, and started "swinging" at Roseburr. According to Roseburr's trial testimony, appellant swung at her face three times before hitting Roseburr hard on the left temple, leaving her "kind of … dazed." After Roseburr recovered from her daze, she repeatedly told appellant to stop and that she was five months pregnant, but appellant "just continued to fight."

Roseburr recalled falling back on the bed and appellant getting on top of her with her full weight and digging her nails into the sides of Roseburr stomach. Then the man who had been telling appellant to calm down came into the room, told appellant to stop, and held her back. While the man was holding appellant, appellant bit Roseburr three times, twice on her chest and once on her breast. Appellant then bit down painfully on Roseburr's wrist. Roseburr finally had to bite appellant back in order to get appellant to let go.

After appellant let go, Roseburr grabbed her phone, called 911, and ran through the house looking for Alexander but did not see him anywhere. Roseburr then went out in front of the house to wait for the police and ambulance to arrive. She noticed appellant had already gotten into her car. She then watched as appellant drove her car into the back of Alexander's gold Pontiac, before backing up and then driving it into his silver Mercedes.

Regarding the damage appellant inflicted on Alexander's cars, Roseburr testified: "There was rear-end damage done to the gold Pontiac, and the Mercedes had rear-end damage because, you know, she ran into the back of the cars. And the Mercedes also went forward into the house. And so it had front damage as well."

Roseburr could not recall whether appellant had made any threats against her during the incident, explaining she was not really paying attention to what appellant was saying at the time. Roseburr was unable to recall her prior police statement claiming appellant had threatened to kill her.

3.

Bakersfield Police Officer Edgar Aguilera was dispatched to Alexander's house in response to the incident on October 9, 2013. When he arrived at the house, Officer Aguilera saw appellant sitting in the driver's seat of a black Honda. Appellant's car was "wedged underneath the Mercedes with extensive damage to the rear-end of the Mercedes and damage to the front of the Honda." As Officer Aguilera got out of his patrol car, appellant got out of her car and went up and started banging on Alexander's front door.

Officer Aguilera testified there was "a lot of commotion" in front of the house. Appellant was taken into custody after Officer Aguilera and his partner made contact with everybody in front of the house. Officer Aguilera explained that they were all pointing at appellant and saying she was the one who broke the windows of the house.

When Officer Aguilera and other officers went inside Alexander's house, they found it to be "a mess" with numerous broken items, including two broken flat-screen televisions. Officer Aguilera estimated that it would cost around $2,000 to purchase a 64-inch model flat-screen television, and around $2,500 to purchase a newer, thinner 65-inch model, like the two broken televisions found inside the house.

While Bakersfield Police Officer Brandon Doyle was transporting appellant to jail, she admitted to him that she broke the two flat-screen televisions inside the house, as well as a glass table. She also admitted that she had bitten Roseburr. When Officer Doyle asked why and how many times she had bitten her, appellant told him "she could not remember because she was too angry."

**The defense**

Appellant testified on her own behalf, stating she went over to Alexander's house on the night of October 9, 2013, to talk to him because their young daughter had gotten sick and she did not have the money to buy medicine for the child. At that time, appellant considered both Alexander's house and her mother's apartment to be appellant's home.

Appellant testified that when she knocked on Alexander's front door, he opened the interior door but kept the exterior screen door closed. After Alexander questioned appellant about why she was there, they got into an argument and started yelling at each other. Appellant estimated their argument at the front door lasted only about two minutes before Alexander closed the door.

Less than a minute later, appellant knocked on the door again. Alexander opened the door and ran out of the house and across the street. Appellant testified: "At that point I knew something was going on. I just didn't know exactly what was going on. So I followed him across the street to the neighbors, and we were arguing this whole time." Their argument in front of the neighbor's house lasted about a minute before the neighbor opened the door and let Alexander inside.

Appellant walked back across the street to Alexander's house and "just started breaking stuff." Before entering the house, she broke the window. Then she went inside and broke a flat-screen television in the living room. After appellant broke the television, Alexander's friend, Marquette Green, came inside the house and tried to calm appellant down, telling her, "Don't do this. You don't have to do all this." Appellant told Green to get out of her way and went into the kitchen, where she pulled out the drawers.

Appellant then returned to the hallway and started walking down to the master bedroom, where she was planning to break the second flat-screen television, but she found the bedroom door to be locked. Regarding what happened next, appellant testified: "I decided to kick the door in. I was actually trying to go in the bedroom just to break the other TV that I bought. At the time I just felt like, you know, I am not going to let you enjoy watching … any TV I bought with any other women." Appellant claimed she bought the two flat-screen televisions she damaged inside Alexander's house with money she received at "income tax time."

Appellant testified that when she saw Roseburr inside the master bedroom, she "just went for her." But before appellant could reach Roseburr, Green grabbed appellant

5.

and placed her in a "bear hug" and held her hands down by her side.  Roseburr pulled appellant's braids, causing the three of them to fall down on the bed with appellant on top of Roseburr and Green on top of appellant, while Green continued to hold appellant in a bear hug.

Roseburr then bit appellant's face, getting "a good grip" underneath appellant's lip.  Appellant claimed she bit Roseburr back in self-defense, testifying:  "[O]nce she bit me, I just started fighting, anywhere that I could grab for her to let go of my face, which probably was her shoulder or chest or something.…  [W]herever I can grab on to.  And I think I bit her a couple more times."

Maintaining his hold on appellant, Green raised her up from the bed.  Appellant then saw Roseburr get up, get her phone to make a call, and walk into the master bathroom.  Less than a minute later, Roseburr returned to the bedroom as Green was letting go of appellant.  Appellant walked around Green and then walked to the front of the house and went outside to look for Alexander.

After she walked outside the house, appellant briefly returned inside to grab a table from the living room.  She took the table outside and dragged it over to where Alexander's Mercedes was parked and "started throwing the tile out of the table at the car."  Green again tried to calm appellant down and told her to stop.  Appellant testified: "I was just, like, 'No.  Where is he at?  Go get him.  Just tell him to come outside and talk to me.' He was still in the neighbor's house at this time."

Appellant further testified:  "What happened after that was I got in my car.  I was about to leave.  I backed out.  I was about to leave.  When I was about to leave, I was so upset, I hit the Grand Am.  Once I had hit it, I was so upset, I just turned around, backed up, went into the driveway, and hit the Mercedes.  My thoughts in my head at that moment was I helped him pick this car out that he's using to pick up women to cheat on me with."  Appellant elaborated in her testimony:  "He purchased the car in LA.  We were together in a relationship living together during this time he was looking through

6.

cars. We were looking online at first. And then I was like, oh, that's a good one, and we went to LA to go purchase this car, which is the Mercedes."

Appellant confirmed that when she first entered Alexander's house it was with the intention of breaking things—including the furnishings and televisions—inside the house. Appellant claimed she did not know anyone else was inside the house at that time but was angry with Alexander because she thought "he probably had plans on either going out with his friends or having company over, another woman come over." Appellant confirmed she became increasingly angry with Alexander as the incident progressed.

**Rebuttal**

The prosecution called as a rebuttal witness Alejandro Trinidad, who had 37 years' experience in the "auto body and paint industry." Regarding the damage appellant inflicted on Alexander's cars by driving into them, Trinidad estimated it would cost roughly between $4,500 to $8,500 to repair the Mercedes, and between $800 and $1,500 to repair the Pontiac, and explained the bases of his estimates.

**The Verdict and Sentencing**

Appellant was tried by a jury in February 2014, and convicted of the above-mentioned felony vandalism counts, which were prosecuted based on appellant's actions of damaging the home furnishings, including the flat-screen televisions, inside Alexander's house (count 2), and her actions afterwards of driving into the Mercedes (count 6) and Pontiac (count 7) in front of the house. As to each vandalism count, the jury specifically found that appellant inflicted damage in excess of $400, making each offense a felony, instead of a misdemeanor (§ 594, subd. (b)(1)).

The jury also convicted appellant of one count of residential burglary, with a finding that a person was present in the residence during the commission of the offense (§§ 460, subd. (a), 667.5, subd. (c)(21); count 1), and one count of misdemeanor assault, which was the lesser included offense of the original charge of assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4); count 3).

7.

The jury acquitted appellant of one count of criminal threats (§ 422; count 4), and a second criminal threats count (count 5) was dismissed on the prosecution's motion prior to the commencement of trial.

The trial court sentenced appellant to a total prison term of seven years four months as follows:  the upper term of six years for count 1, plus two consecutive eight-month terms for counts 6 and 7, a concurrent jail term for count 3, and the term for count 2 was stayed pursuant to section 654.

## *DISCUSSION*

**I.**    **The trial court did not err when it deferred ruling on appellant's section 1118.1 motion until after permitting the prosecution to call Trinidad as a rebuttal witness.**

Appellant contends the trial court erred and violated her right to due process when it "refused" to rule on her motion for a judgment of acquittal under section 1118.1 (§ 1118.1 motion) as to counts 6 and 7, at the time the motion was made, and permitted the prosecution to offer improper rebuttal testimony from Trinidad to show "the amount of defacement, damage, or destruction" appellant inflicted on each of Alexander's cars was "four hundred dollars ($400) or more" (§ 594, subd. (b)(1)).  We find no error in the court's actions concerning appellant's section 1118.1 motion.

### *A.    Additional background*

After the close of the prosecution's case-in-chief, the trial court noted that defense counsel "at side bar, did inform the Court that he was going to make [a section] 1118.1 motion."  The court advised the parties that "[f]or scheduling purposes" it would address the section 1118.1 motion at the close of the defense's case and found the motion "would otherwise be deemed timely."  The defense did not object to the court's plan.

After the defense rested, the following discussion occurred:

> "THE COURT:  Thank you. [¶] [Defense counsel], you said that you had [a section] 1118.1 motion. [¶] Would you like to make that now?

8.

"[DEFENSE COUNSEL]:  Yes, Your Honor.  Yesterday after the prosecution's case-in-chief, I did ask for a sidebar.  I informed the Court and the deputy district attorney of asking for [a section] 1118.1 motion, directed verdict on all charges, in particular, Counts 6 and 7, the vandalism as to the vehicles.  Based on the prosecution's case-in-chief, I believe the prosecution has not presented evidence as to the amount of the damage, or whatnot, of the vandalism to the vehicles involving this case.…  I believe that's the state of the evidence at this point in time—or up to this point in time.  So I'll be asking that [counts 6 and 7] be taken away from the jury and that a verdict of not guilty or an acquittal be entered into the system.…

"THE COURT:  Thank you. [¶] [Prosecutor], any comment?

"[THE PROSECUTOR]:  Your Honor, I'd just request that the Court reserve ruling on that motion until the conclusion of the People's rebuttal evidence.  I do have a witness I believe who will testify as to any elements of those counts that is lacking.

"THE COURT:  Thank you.

"As to Counts 1 through 4, the Court is going to deny the motion finding that there has been sufficient evidence presented to this jury that will allow them to decide whether the defendant is guilty.  The Court would find on its own that the defendant is guilty of those charges based on the evidence presented.

"As to Count 6 and 7, the Court will reserve ruling recognizing that the People do intend to present … a rebuttal case and, in doing so, will address, at least as represented, the damages issue as it relates to Counts 6 and 7.

"The Court further recognizes that on—during the defense's case-in-chief, the area was addressed regarding damages and vandalism specifically, and in doing so, questions were asked regarding potential damages, additionally, on cross-examination, the area of damages and as to the vandalism allegations.  And it's the Court's belief that a rebuttal case can be used and can be formed to address those issues that were originally addressed on—during the defense's case-in-chief.  So the Court will reserve ruling as to Counts 6 and 7."

The defense again did not object to the court's decision to defer ruling on the section 1118.1 motion and to permit the prosecution to present rebuttal evidence on the issue of damages for counts 6 and 7.

9.

After Trinidad testified as a rebuttal witness and the prosecution rested, the trial court stated: "[A]t this time the [section] 1118.1 motion to Count 6 and 7 is denied based on the rebuttal evidence the Court heard."

### B. *Applicable legal principles*

Section 1093 provides the procedural order for criminal trials: the prosecution presents its case, the defense then presents its evidence, which is then followed by rebuttal testimony "only, unless the court, for good reason, in furtherance of justice, permit[s the parties] to offer evidence upon their original case." (§ 1093, subds. (c) & (d).)

"'If evidence is directly probative of the crimes charged and can be introduced at the time of the case in chief, it should be.' [Citation.] '[P]roper rebuttal evidence does not include a material part of the case in the prosecution's possession that tends to establish the defendant's commission of the crime. It is restricted to evidence made necessary by the defendant's case in the sense that he has introduced new evidence or made assertions that were not implicit in his denial of guilt.' [Citation.] [¶] The reasons for the restrictions on rebuttal evidence are 'to (1) ensure the orderly presentation of evidence so that the trier of fact is not confused; (2) to prevent the prosecution from "unduly magnifying certain evidence by dramatically introducing it late in the trial;" and (3) to avoid "unfair surprise" to the defendant from sudden confrontation with an additional piece of crucial evidence.'" (*People v. Mayfield* (1997) 14 Cal.4th 668, 761.)

Section 1094 also provides for a departure from the typical procedure "[w]hen the state of the pleadings requires it, or in any other case, for good reasons, and in the sound discretion of the court." Sections 1093 and 1094 have been interpreted as giving trial courts "'broad discretion to order a case reopened and allow the introduction of additional evidence [citations].' [Citation.] 'No error results from granting a request to

reopen in the absence of a showing of abuse.'" (*People v. Riley* (2010) 185 Cal.App.4th 754, 764 (*Riley*).)

In *Riley*, the defendant moved for acquittal under section 1118.1 after the close of the People's case-in-chief on the ground that there was no evidence that the 0.47 grams of marijuana found in the defendant's purse constituted a usable amount. (*Riley*, *supra*, 185 Cal.App.4th at p. 759.) The appellate court found the trial court properly allowed the People to reopen in order to present such evidence. "[W]e conclude that section 1118.1 does not place a limitation on the trial court's discretion under sections 1093 and 1094 to permit either party to reopen its case for good cause and when justice so requires. The purpose of section 1118.1 is to provide a procedure by which a defendant may promptly terminate a fatally deficient prosecution, not to provide the defendant with a tactical trap when the prosecution inadvertently fails to present evidence in its possession." (*Id.* at p. 766.)

In *Riley*, *supra*, 185 Cal.App.4th at pp. 764–765, the court relied on *People v. Goss* (1992) 7 Cal.App.4th 702, 708, which observed: "The court always has discretion to allow the prosecution to reopen after a section 1118 motion so long as the court is convinced that the failure to present evidence on the issue was a result of 'inadvertence or mistake on the part of the prosecutor and not from an attempt to gain a tactical advantage over [the defendant].'"

### C.     Analysis

Appellant has failed to demonstrate the trial court abused its discretion in permitting the prosecution to reopen its case, which is a more accurate description of what the court did here, when it reserved its ruling on appellant's section 1118.1 motion until after presentation of the prosecution's "rebuttal case." There is nothing in the record indicating the prosecutor's failure to present Trinidad's testimony earlier was the result of anything more than an inadvertent omission. There is no indication the prosecutor knew about the evidence and elected not to introduce it in the case-in-chief

and to introduce it in rebuttal where it would have a more powerful impact. Nor did appellant claim to be surprised by or otherwise object to the additional evidence, which built upon evidence already presented to the jury during the prosecution's case-in-chief and, as the trial court noted, addressed issues raised in appellant's cross-examination testimony.

During the prosecution's case-in-chief, the prosecution presented evidence showing that appellant caused fairly extensive damage to Alexander's two cars when she drove into them. That damage was described by witnesses and depicted in photographs introduced into evidence. On cross-examination, appellant acknowledged her insurance company paid to repair the damage she caused to Alexander's cars. However, appellant claimed that she "couldn't tell" the prosecutor how much the repairs cost, explaining, "[t]hat's between [Alexander] and the insurance company."[2] Trinidad, who confirmed he had experience preparing car-repair estimates for purposes of insurance coverage, based his estimates concerning the Mercedes and Pontiac cars on his assessment of photographs previously introduced during the prosecution's case-in-chief, and his explanations mirrored descriptions of the damage provided by previous prosecution witnesses.

Given that it was fairly easy to prove that appellant's acts of vandalism on each of the cars resulted in damage exceeding $400, it appears likely that the failure to offer the evidence earlier was truly an oversight by the prosecutor, which could very well account for the absence of any inquiry by the trial court or defense counsel into the reasons for the prosecutor's delay. In other words, there does not appear to have been a strategic reason for failing to offer the evidence during the original case-in-chief. Given the apparent mistake on the part of the prosecutor, we conclude that the trial court did not abuse its

---

[2]    The prosecution presented evidence indicating that Alexander, who did not testify as a witness in this case, was sympathetic to appellant and engaged in various tactics to try to pressure Roseburr to "drop the charges" and not testify against appellant, after the incident on October 9, 2013.

discretion by permitting the prosecution, in essence, to reopen its case-in-chief to call Trinidad as a witness. (See *Riley*, *supra*, 185 Cal.App.4th at pp. 766–767.) Since there was no error, defendant was not denied due process. (*People v. Sanders* (1995) 11 Cal.4th 475, 510, fn. 3.)

## II.     Appellant was properly convicted of multiple counts of felony vandalism.

Appellant contends the evidence in this case showed her acts of vandalism were committed pursuant to a single intention, general impulse, and plan, and, therefore, constituted but a single offense for which she could suffer a conviction of felony vandalism under *Bailey*, *supra*, 55 Cal.2d 514. In support of her contention, appellant emphasizes the facts her acts of vandalism were committed close together in time, directed at a single victim (i.e., Alexander), and generally motivated by anger and jealousy arising from Alexander's cheating behavior. Thus, appellant asserts the "acts that inflicted damage to the household furnishings, the Pontiac, and the Mercedes—all of which belonged to Alexander—were all committed in a single expression of passion and jealousy on a single occasion." We disagree with appellant's contention and conclude the evidence in this case can be reasonably interpreted as showing the offenses were separate and distinct and not committed pursuant to one intention, general impulse, or plan. Therefore, we cannot accept appellant's assertion that her acts of vandalism constituted a single offense as a matter of law.

### A.     *Applicable legal principles*

Normally, every separate act that violates one or more statutes gives rise to a separate offense. (*People v. Neder* (1971) 16 Cal.App.3d 846, 851-852.) "In general, a person may be *convicted* of, although not *punished* for, more than one crime arising out of the same act or course of conduct. 'In California, a single act or course of conduct by a defendant can lead to convictions "of *any number* of the offenses charged."'" (*People v. Reed* (2006) 38 Cal.4th 1224, 1226–1227.)

13.

In *Bailey*, *supra*, 55 Cal.2d 514, our Supreme Court created an exception to the general rule allowing multiple convictions. *Bailey* held that the prosecutor could charge a defendant's ongoing receipt of welfare benefits arising from a single fraudulent application as a single count of grand theft rather than as discrete, separate petty thefts because the thefts were all committed "pursuant to one intention, one general impulse, and one plan." (*Id.* at p. 519.)

"Subsequent decisions have construed *Bailey* as being a two-sided coin, granting criminal defendants the right to insist upon the dismissal of all but one conviction when multiple crimes are unified by a single intent, impulse or plan." (*People v. Kirvin* (2014) 231 Cal.App.4th 1507, 1517 (*Kirvin*).) This "'converse *Bailey*' doctrine" has been applied to crimes that treat harm or damage as an element and permit the prosecutor to aggregate that harm or damage—crimes such as theft and vandalism. (*Kirvin*, at pp. 1517–1518; *People v. Tabb* (2009) 170 Cal.App.4th 1142, 1149 (*Tabb*) [multiple acts of theft consolidated to a single felony offense]; *People v. Carrasco* (2012) 209 Cal.App.4th 715, 717 [multiple acts of vandalism against different property owners consolidated to a single felony offense].) "Until recently, the converse *Bailey* doctrine applied with full force to this category of offenses, and entitled a defendant to dismissal of all but one conviction for multiple crimes, even if each involved a complete criminal act, as long as the crimes were committed 'pursuant to a single general impulse, intention or plan.'" (*Kirvin*, at p. 1518.)

In *People v. Whitmer* (2014) 59 Cal.4th 733, 741 (*Whitmer*), the court disapproved this earlier precedent and held that a defendant could suffer multiple convictions of grand theft "based on separate and distinct acts of theft, even if committed pursuant to a single overarching scheme." The court reasoned: "[A] serial thief should not receive a '"felony discount"' if the thefts are separate and distinct even if they are similar." (*Id.* at pp. 740–741.) The *Whitmer* court recognized that its decision marked an abrupt departure from

14.

current law and thus would only apply prospectively. (*Id.* at pp. 741–742.) The court thus concluded:

> "Under the law that has existed for decades, defendant could only have been convicted of a single count of grand theft. We cannot apply the new rule retroactively to him. Accordingly, and for this reason only, we reverse the judgment of the Court of Appeal, which had affirmed the judgment of conviction for the 20 counts of grand theft." (*Id.* at p. 735.)

### B. Analysis

Assuming appellant is correct that pre-*Whitmer* law applies to her felony vandalism convictions because that case was decided after she committed the offenses in this case, we nonetheless disagree that application of *Bailey* compels the conclusion that appellant's acts of vandalism constituted but a single offense for which she could be properly convicted of only one count of felony vandalism.

Typically, the question of whether multiple criminal acts are committed pursuant to one intention, general impulse, and plan is a question of fact for the jury based on the particular circumstances of each case. (*People v. Packard* (1982) 131 Cal.App.3d 622, 626.) On appeal, we uphold the fact finder's conclusion if it is supported by substantial evidence. (*Tabb*, *supra*, 170 Cal.App.4th at pp. 1149–1150.) Where the evidence supports only one reasonable conclusion, the question may be resolved as a matter of law. (*Packard*, at pp. 626–627.)

This question was never specifically put to the jury in this case. Rather, appellant's conduct was charged and prosecuted as three separate and distinct counts of felony vandalism. Appellant now appears to be arguing, in essence, that the only reasonable conclusion supported by the prosecution's evidence was that all her acts of vandalism were united by a single intent, general impulse, and plan, and, therefore, *as a matter of law*, constituted a single offense.

Appellant's conclusion, however, is not the only reasonable one supported by the evidence. "Whether a series of wrongful acts constitutes a single offense or multiple

15.

offenses depends upon the facts of each case," and a defendant may be properly convicted of separate counts charging felony vandalism involving a single victim, "if the evidence shows that the offenses are separate and distinct and were not committed pursuant to one intention, one general impulse, and one plan." (*Bailey*, *supra*, 55 Cal.2d at p. 519.) "The test applied … in determining if there were separate offenses or one offense is whether the evidence discloses one general intent or separate and distinct intents." (*Ibid.*)

Notwithstanding appellant's assertions to the contrary, the evidence in this case could be reasonably construed as disclosing separate and distinct intents for the acts of vandalism underlying counts 2, 6, and 7. Therefore, we cannot accept appellant's claim that she was improperly convicted of multiple counts of felony vandalism as a matter of law.

As the prosecutor highlighted in closing argument, appellant admittedly entered Alexander's house with the intention of "breaking stuff" inside the house, including the flat-screen televisions. While there was minimal discussion of the vandalism counts in closing argument, the prosecutor relied on evidence of appellant's intent to vandalize property inside the house to support the specific intent element of the residential burglary, and this evidence provided support for the conclusion that appellant formed a distinct and separate intent with respect to her vandalism of the property inside the house.

The evidence in this case also supported the conclusion that appellant formed separate and distinct intents regarding her subsequent acts of vandalizing Alexander's two cars, even assuming those acts were more generally motivated by the same anger and jealousy motivating her earlier acts of vandalizing items inside Alexander's house. Appellant repeated several times in her direct examination testimony that she was *about to leave*, when she got into her car and backed up, suggesting that, at that point, she viewed her initial plan of "breaking stuff" inside Alexander's house as complete and that her subsequent actions of driving into his cars were not simply an extension of a single

angry rampage or impulse. Instead, her testimony could be reasonably construed as showing she had been planning to leave Alexander's house, when she made a conscious (albeit quick) decision to change her plan of driving away and formed a new plan of driving her car into the back of Alexander's Pontiac.

Similarly, appellant's testimony, combined with evidence of the more extensive damage she inflicted on the Mercedes, provided support for the conclusion that she formed a separate intent and was acting pursuant to a new plan and different impulse, when, after hitting Alexander's Pontiac, she decided to back up and drive her car even more forcefully into his Mercedes. Appellant described in considerable detail her contemporaneous, motivating thoughts, which focused on her personal involvement in helping Alexander pick out and buy the Mercedes. Her testimony thus belies her suggestion on appeal that she was merely acting in a blind rage. Instead, appellant's testimony indicates her acts of vandalism, although occurring close together in time, and aimed at a single victim, were the product of deliberate choices on appellant's part and disclosed multiple, if similar, intents.

For all the forgoing reasons, we cannot agree with appellant's contention that, as a matter of law, the evidence in this case showed her acts of vandalism constituted a single offense. Therefore, we reject her claim that that her conviction of three separate counts of felony vandalism was impermissible under *Bailey*.

## III.    Appellant's sentence on counts 6 and 7 did not violate section 654.

Appellant contends that the consecutive 8-month terms the trial court imposed for counts 6 and 7 must be stayed under section 654. This is so, she argues, because "[a]ll three acts of vandalism involved an indivisible transaction undertaken with a single criminal objective." We disagree.

### A.    Applicable legal principles

Section 654 provides that an act that is punishable in different ways by different provisions of law must be punished under the provision that provides for the longest

17.

potential term of imprisonment, and may not be punished under more than one provision. The Supreme Court has extended the protections of section 654 to cases in which several offenses are committed during a course of conduct deemed to be indivisible in time. (*People v. Harrison* (1989) 48 Cal.3d 321, 335 (*Harrison*).)  The purpose of section 654 is to insure that the defendant's punishment is commensurate with his culpability. (*People v. Perez* (1979) 23 Cal.3d 545, 552.)

Whether section 654 applies is a question of fact for the trial court that will not be reversed on appeal if there is any substantial evidence to support it.  (*People v. Vang* (2010) 184 Cal.App.4th 912, 915–916.)

Whether a course of conduct is indivisible depends on the intent and objective of the actor.  (*Harrison*, *supra*, 48 Cal.3d at p. 335.)  If all of the offenses were the means of accomplishing one objective, the defendant may be found to have harbored a single intent and may be punished only once.  (*Neal v. State of California* (1960) 55 Cal.2d 11, 19.) Alternatively, if the defendant harbored multiple criminal objectives, which were independent of each other, he may be punished for each statutory violation, even though the violations were parts of an indivisible course of conduct.  (*Harrison*, *supra*, 48 Cal.3d at p. 335.)

### B. *Analysis*

According to appellant, "all the vandalism counts arose from a single, indivisible course of conduct, the collision of appellant's vehicle into two vehicles owned by a single victim (Alexander), which immediately followed the vandalism of Alexander's residence and the household furnishings." Appellant further asserts that "it may not credibly be maintained that immediately after having been in a fight with Roseburr, destroying two television sets and other items within the house, breaking a window, an interior door, and a table from the living room that the acts of hitting the Pontiac and Mercedes were committed with a separate intent and objective."

For the same reasons discussed above in rejecting appellant's contention that she could not be properly convicted of multiple counts of felony vandalism under *Bailey* because her acts of vandalism disclosed a single intent, general impulse, and plan, we reject her section 654 argument and conclude there was substantial evidence appellant harbored multiple criminal objectives in committing counts 2, 6, and 7. Therefore, the trial court did not err in imposing consecutive terms on counts 6 and 7 based on its finding that the offenses represented "separate occasions" and "not one course of abhorrent behavior."

### *DISPOSITION*

The judgment is affirmed.

19.

_____
HILL, P.J.

WE CONCUR:


_____
KANE, J.


_____
POOCHIGIAN, J.

20.